## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | :     **CRIMINAL NO. 14-496** |
| DONALD WOMACK, | : |
|    a/k/a "Rock," | |
| NATHANIEL COLES | : |
|    a/k/a "Daz," | |
|    a/k/a "D" | : |

### GOVERNMENT'S OMNIBUS RESPONSE IN OPPOSITION TO
### DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

The United States of America, by and through its attorneys, Louis D. Lappen, Acting

United States Attorney in and for the Eastern District of Pennsylvania, and A. Nicole Phillips

and Robert E. Eckert, Assistant United States Attorneys for the district, submits this omnibus

response in opposition to defendants Donald Womack and Nathaniel Coles' motions for

judgment of acquittal and new trial pursuant to Federal Rules of Criminal Procedure Rules 29(c)

and 33(a).

## I.    INTRODUCTION

From on or about January 27, 2014 to in or around February 2014, defendants Paris

Church, Nathaniel Coles, and Donald Womack, along with co-defendant Michael Pinkney,

conspired together to obtain more than 5 kilograms of cocaine from a source of supply in Mexico

known as "Daniel." The bulk of the evidence supporting this charge was derived from a court-

authorized Title III wiretap investigation of Paris Church's telephones conducted by the Federal

Bureau of Investigation ("FBI") and Drug Enforcement Administration ("DEA"). On December

13, 2013, the Honorable Berle M. Schiller of the United States District Court for the Eastern District of Pennsylvania (as Emergency Judge) authorized the interception of wire and electronic communications over Paris Church's phone number 484-361-2943. Interception pursuant to this authorization began on December 13, 2013, and was renewed on January 10, 2014, February 7, 2014, and March 7, 2014. Interceptions ended on or about April 5, 2014. Defendants Coles, Womack, Pinkney, and the Mexican source of supply, "Daniel," among others, were intercepted in communications with defendant Church during the wiretap investigation.

The intercepted phone calls and text messages" revealed a plan between Church, Womack, Coles and Pinkney to obtain 18-20 kilograms of cocaine from a Mexican source of supply, "Daniel." The evidence established that defendants Womack, Church and Coles each communicated with "Daniel" at various times during the conspiracy to discuss the details of the plan which was for "Daniel" to arrange for a courier to drive a car containing the kilograms of cocaine across the Mexican border to Houston, Texas. Co-defendant Michael Pinkney was then making arrangements for he and Church to meet the courier in Houston for the cocaine and get it back to the Chester area for redistribution.

In furtherance of the conspiracy, at the request of "Daniel," Church sent $300 via Western Union for expenses for the courier. Although "Daniel" initially followed up with defendants Womack, Church and Coles regarding the delivery of the cocaine, he stopped communicating and the cocaine was never obtained by the defendants.

## II.     PROCEDURAL BACKGROUND

On September 17, 2014, the above-referenced defendants were charged in a one count indictment with conspiracy to possess with the intent to distribute five kilograms or more of

cocaine in violation of Title 21 U.S.C. § 841(a)(1), (b)(1)(A).

On February 16, 2017, after a five-day trial, a jury unanimously convicted defendants Paris Church, Donald Womack, and Nathaniel Coles, of the sole count of the indictment, conspiracy to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846.[1] Prior to sending the case to the jury, the defendants made oral motions for judgement of acquittal pursuant to Federal Rule of Criminal Procedure 29. The defendants argued that the government had failed to present sufficient evidence of their participation in the charged conspiracy. After hearing argument from the defendants' counsel and counsel for the government, this Court denied the defendants' motions. Trial Tr. 2/15/2017, p. 147-156.

In his instant post-verdict motion for judgement of acquittal, defendant Coles, through counsel, challenges the sufficiency of the evidence, arguing as he did in his oral Rule 29 motion, that the facts presented during the trial are directly analogous to *United States v. Pressler*, 256 F.3d 144 (3d Cir. 2001), and thus insufficient to prove conspiracy as a matter of law. He further argues that the jury's verdict on the interrogatory regarding the weight of drugs sought by the conspiracy must be set aside. See Coles Mot. 3-5. Defendants Coles and Womack also subsequently filed *pro se* motions for judgement of acquittal challenging the sufficiency of the evidence and challenging the credibility of government witnesses. See Dkt. Nos. 201 and 202.

Because the government presented sufficient evidence to prove the existence of the conspiratorial agreement between the defendants to obtain multiple kilograms of cocaine from "Daniel," the Mexican source of supply, as affirmed by the jury's guilty verdict, the defendants'

---

[1]    The jury answered interrogatories in which they found that the amount of cocaine involved in the conspiracy that was attributable to each defendant was five kilograms or more.

instant motions should be denied.

## III.  DISCUSSION

Federal Rule of Criminal Procedure 29, provides that, upon motion by a defendant, the Court must enter a judgment of acquittal after the discharge of the jury where the evidence is insufficient to sustain a conviction. Fed. R. Crim. P. 29. In reviewing a jury verdict for insufficiency, the Court must consider the evidence in the light most favorable to the government, and affirm the judgment if any rational trier of fact could have found proof beyond a reasonable doubt based on the evidence and the logical inferences that flow from the evidence. *United States v. Silveus*, 542 F.3d 993, 1002 (3d Cir. 2008); *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1989). A claim of insufficiency of evidence, therefore, places a very heavy burden on a defendant.

The Court's review of the sufficiency of the evidence is "highly deferential." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc). The question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original). The reviewing court "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *Caraballo-Rodriguez*, 726 F.3d at 430, quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). "The district court . . . [is] not to act as a thirteenth juror.  Instead, the jury's verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'" *Caraballo-Rodriguez*, 726 F3d at 431,

quoting *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012). *See also Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) ("A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.").

Accordingly, "[a] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam), quoting *Jackson v. Virginia*, 443 U.S. at 326 (1979). Therefore, "[w]hile evidence proffered at trial may be consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict – and not to usurp the role of the jury – as long as it passes the 'bare rationality' test. Reversing the jury's conclusion simply because another inference is possible – or even equally plausible – is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges . . . . It is up to the jury – not the district court judge or our Court – to examine the evidence and draw inferences. Unless the jury's conclusion is irrational, it must be upheld." *Caraballo-Rodriguez*, 726 F.3d at 432.

Federal Rule of Criminal Procedure 33 provides that a district court may order a new trial where the jury's verdict is contrary to the weight of the evidence, only if it believes that there is a serious danger that a miscarriage of justice has occurred, that is, that an innocent person has been convicted. *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). The Third Circuit has held that motions for new trial based on the weight of the evidence are not favored. *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997). Such motions are to be granted sparingly, and only in exceptional cases. *Government of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir.

1987). The evidence presented was overwhelming in this trial of these defendants, and there was no danger of a miscarriage of justice requiring a new trial.

In the trial of defendants Church, Womack, and Coles, the government presented substantial evidence proving each defendants' participation in the conspiracy. This evidence was presented to the jury in the form of law enforcement and cooperating witness testimony (both fact and expert witnesses), electronic surveillance, intercepted telephone communications (calls and text messages), business and public records, and telephone toll records and analysis. Viewing this evidence and all logical inferences in the light most favorable to the government, the evidence was more than sufficient for a reasonable trier of fact to find each of the defendants guilty beyond a reasonable doubt.

In order to establish the existence of a drug conspiracy under Title 21, United States Code, Section 846, the government must prove the following: "(1) a unity of purpose between the alleged conspirators; (2) an intent to achieve a common goal; (3) and an agreement to work together toward that goal." *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008) (citation omitted). The government is not required to prove the existence of an express or formal agreement – a tacit understanding is sufficient. *United States v. Iannelli*, 420 U.S. 770, 777 n.10 (1975). Indeed, each element of a conspiracy charge can be established entirely by circumstantial evidence. *United States v. Applewhaite*, 195 F.3d 679, 684 (3d Cir. 1999). "The existence of a conspiracy 'can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as a result of a preconceived scheme or common understanding."

*United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999), quoting *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986).

To sustain a conspiracy conviction, the government need only show sufficient evidence that the defendant conspired with "someone – anyone." *United States v. Pressler*, 256 F.3d 144, 149 (3d Cir. 2001), quoting *United States v. Obialo*, 23 F.3d 69, 73 (3d Cir. 1994). A single overarching conspiracy exists where there is evidence of a large general scheme, and aid given by some conspirators to others in aid of that scheme. *United States v. Bobb*, 471 F.3d 491, 494-95 (3d Cir. 2006); *United States v. Reyes*, 930 F.2d 310, 312-13 (3d Cir. 1991). This Court has held that "a single conspiracy may involve numerous suppliers and distributors operating under the aegis of a common core group." *United States v. Quintero*, 38 F.3d 1317, 1337 (3d Cir. 1994).

In *Gibbs*, the Third Court highlighted a number of factors to be considered in making an evaluation of whether one is a member of a conspiracy: "the length of affiliation between the defendant and the conspiracy; whether there is an established method of payment; the extent to which transactions are standardized; "whether there is a demonstrated level of mutual trust;" and knowledge of a buyer that a seller sells to people other than himself, and knowledge of a seller that a buyer is a reseller. *Gibbs*, 190 F.3d at 199, 201; *see also United States v. Perez*, 280 F.3d 318, 343 (3d Cir. 2002). The Court also examined whether the transactions involved a large amount of narcotics, reasoning that "a large transaction or an accumulation of deals suggests more trust, garnered over a period of time, as well as a greater likelihood that the parties have 'put their heads together' to figure out planning, organization, and ways to conceal their activities." *Gibbs*, 190 F.3d at 199; *see also Perez*, 280 F.3d at 345. The government is not

required, however, to prove all of these factors, as the presence of one or more of the factors furthers the inference that the buyer knew that he was part of a larger operation, and therefore can be held responsible as a co-conspirator. *Iglesias*, 535 F.3d at 156.

In *Iglesias*, this Third Circuit held that the evidence was sufficient to find the defendant-drug supplier and a drug purchaser had entered into a drug distribution conspiracy despite only a few transactions. *Iglesias*, 535 F.3d at 156. Specifically, the defendant, Iglesias, sold methamphetamine "once or twice" to a man named Shisler. The defendant sold the drugs to Shisler at the defendant's home. Further, the defendant had allowed Shisler to defer payment on the drugs until after Shisler had sold the drug to his customers. *Id.*   Thus, the Court held that the evidence was sufficient for a reasonable juror to have concluded that the defendant and Shisler shared a common goal and a tacit agreement to cooperate to achieve it. *Id.*

Other factors may also be considered. For instance, extensive use of phones or the use of coded language between the parties is also indicative of a conspiratorial relationship. *United States v. Rodriguez*, 215 F.3d 110, 117 (1st Cir. 2000). The use and understanding of coded language is also indicative that a defendant has had repeated dealings with the conspiracy and therefore comprehended the nature of group with whom he was dealing. *United States v. Chiltolie*, 596 F. App'x 102, 105 (3d Cir. 2014). Conversely, a mutual level of trust may exist where the defendant and a member of the conspiracy do not speak in code when engaged in drug business. *See, e.g., United States v. Frisby*, 574 F. App'x 161, 164 (3d Cir. 2014) (noting that the lack "of any discussion of price or method of payment" during drug-related phone calls permitted an inference that the defendants "shared a degree of mutual trust indicative of a conspiracy); *United States v. Lampkin*, 562 F. App'x 157, 159 (4th Cir. 2014) (noting use of

8

coded and vague language), cert. denied, 135 S. Ct. 507 (2014). What matters is that the defendant and the individual with whom he is dealing understand each other and comprehend what is transpiring whether the communication consists of code or vaguely worded phrases.

In this case, the government presented substantial evidence at trial to establish that each of the defendants was a member of the conspiracy who shared the common goal of obtaining multiple kilograms of cocaine from the Mexican source of supply, "Daniel," for the purpose of redistributing the cocaine in the Chester area; that each defendant had the intent to achieve that goal; and that there was a tacit agreement between the defendants and co-conspirators Paris Church and Michael Pinkney to achieve the goal.

**Donald Womack**

Contrary to defendant Womack's claims, there was more than sufficient evidence for the jury to reasonably conclude that he was Womack's had conspiratorial relationship with co-defendants Church, Coles, and Pinkney for the shared purpose of obtaining the kilograms of cocaine from "Daniel" for redistribution in the Chester area. In fact, the evidence established Womack's key role in the conspiracy as the person who initiated the scheme by connecting "Daniel" to defendants Church and Coles to communicate regarding obtaining the cocaine from "Daniel."

On January 27, 2014, defendant Womack informed Church of this connection when he texted Church the Mexican phone number, the name "Daniel," and instructed Church to introduce himself as defendant Womack's cousin. Defendant Womack later called Church to see if he had made contact with "Daniel." Trial Tr. 2/14/2017 p. 41, 56. Womack told Church that he had also tried to contact "Daniel." Id. p. 55-56. In fact, defendant Womack was able to make

contact with "Daniel" before Church, so defendant Womack reported to Church that he and "Daniel" discussed "Daniel" having kilograms of cocaine for sale. Id. at p. 57. Defendant Womack also told Church that he (Womack) informed "Daniel" via email that someone would come down to meet him ("Daniel"). Id. at p. 59. Later, as Womack was trying to figure out why Church had not heard from "Daniel" as planned, Womack realized that defendant Coles (who was also communicating with "Daniel") had given "Daniel" Womack's phone number rather than Church's number. Id. p. 63.

Once Church and "Daniel" finally connected via telephone, "Daniel" explained that he had "30 pieces" (coded language for 30 kilograms of cocaine)[2] and his ("Daniel") source had "80" (coded language for 80 kilograms of cocaine) down in a more southern part of Mexico, but his source was willing to allow "Daniel" to delay paying his drug debt until after he sold the cocaine to Church because they knew Church as Womack's cousin. Trial Tr. 2/14/17, Id. at p. 91. In a later discussion of the logistics for the drug transaction, "Daniel" told Church that he could put "18 to 20 pieces" (coded language for 18-20 kilograms of cocaine)[3] in the car that would cross the border from Mexico to Texas where Church would pick it up and transport it back to Pennsylvania. Id. at p. 93. Shortly after this call, Church called defendant Womack and

---

[2] The government presented the intercepted calls between Church and the other defendants through the testimony of DEA Special Agent Randy Updegraff who was qualified by the Court to provide expert testimony regarding the coded language used by the defendants in the intercepted phone calls. To the extent that the defendants' claims attempt to impugn the credibility of the government's witnesses, he invades the providence of the jury, the sole judge of the credibility of the witnesses and a matter beyond the scope of a legal sufficiency challenge.

[3] Agent Updegraff testified that the language in the call concerning "18-20 pieces" referred to 18 kilograms of cocaine. Trial Tr. 2/14/2017 p. 172.

said, "it's the real deal," confirming that the connection with "Daniel" for cocaine" was legitimate. Id. at 98, 99. Church then told Womack that he was going to travel to Texas to get the cocaine. Finally, Church confirmed with Womack that they were going to have access to a significant quantity of cocaine through Daniel when he said, "…it's about to be poppin boy." Id. at p. 98-99. Defendant Womack understood what Church meant when he said, "say no more. I'm a talk to you tomorrow when I see you." Id.

These communications between defendants Church and Womack amply demonstrated that Womack had a stake in the venture to obtain kilograms of cocaine from Mexican source of supply "Daniel," and that defendant Womack's role in the conspiracy was integral to its implementation.

Defendant Womack's vested interest in the outcome of the conspiracy was further established by communications intercepted in the days after January 27, 2014. On January 29, 2014, defendants Church and Womack discussed whether defendant Coles had communicated with "Daniel." Defendant Womack confirmed that defendant Coles had emailed "Daniel." Trial Tr. 2/14/2017, p. 111. After confusion over whether "Daniel" wanted to speak with Church again, defendant Womack told Church to call defendant Coles to straighten things out. Id. In another call, "Daniel" told Church to send $300 for expenses for the courier who was going to drive the car with the kilograms of cocaine across the border from Mexico to Texas. Id. at p. 115-127. Immediately after this call, Church called defendant Womack to discuss "Daniel's" request for $300. Id. at pp. 128, 129. Defendant Womack expressed skepticism about whether they should send the money, but they ultimately agreed to send the money that day. Church said,

11

"it can't hurt us any more than it hurt us already." Defendant Womack replied, "yeah exactly." Id. at p. 129.

A few minutes later, defendant Womack called Church back to express frustration with "Daniel." Church reiterated the arrangements he discussed with "Daniel" – that if they get the $300 to "Daniel" that night, he would able to get the car loaded with the cocaine that night. Id. at p. 130. The government presented Western Union records and surveillance video showing that Church sent the $300 via Western Union to a "Mario Castaneda" as "Daniel" had instructed. Trial Tr. 2/15/17, pp. 89-97.

On January 29, 2014, at approximately 5:51p.m., Church confirmed with "Daniel" that he had sent the $300 to "Mario Castaneda" as "Daniel" instructed, and then provided "Daniel" with the Western Union PIN number so the money can be retrieved. Trial Tr. 2/14/17, pp. 131, 132.

On January 30, 2014, Church called defendant Womack to ask whether defendant Womack asked defendant Coles to call "Daniel." Defendant Womack confirmed that defendant Coles e-mailed "Daniel." Trial Tr. 2/14/2017, p. 138. In two subsequent calls, Church verified with defendant Womack that defendant Coles was contacting "Daniel." Id. at pp. 144-45.

On February 1, 2014, Church told defendant Womack to have defendant Coles reach out to "hit the bull" (coded language meaning to contact "Daniel"). Trial Tr. 2/14/17, p. 142. In a subsequent call, Womack confirmed that he called defendant Coles and told him to contact "Daniel." Id. at p. 144. Church then called defendant Womack again and Womack confirmed that defendant Coles contacted "Daniel." Id. at pp. 144, 145.

On February 2, 2014, after not hearing from "Daniel" about the readiness of the cocaine, defendant Womack told Church that he was going to call "Daniel" himself. Trial Tr. 2/14/17, pp. 148, 149.

On February 3, 2014, defendants Womack and Church discussed that "Daniel" sent either a photograph or email to defendant Coles and Womack was going to have Coles forward it to Church. Trial Tr. 2/14/2017, pp. 156-57. In a subsequent call, Church and defendant Coles discussed that defendant Coles had just talked to defendant Womack about the communication from "Daniel" that defendant Coles had shown to Church but had neglected to show defendant Womack. Id. at p. 158. Defendant Coles also confirmed that he had sent an email ("…sent [him] a mail joint this morning…") to "Daniel" because defendant Womack had instructed him to do so, but "Daniel" had not responded yet. Id. at p. 158, 159.

The government also presented the testimony of cooperating defendant, Michael Pinkney, who gave the jury insight into the agreement based upon his participation in the conspiracy. Pinkney explained his understanding of the agreement and the details of the agreement that he and Church discussed in the intercepted calls. Pinkney testified that in January of 2014, as he and defendant Church were looking for sources of supply for cocaine, Church told him that "D-Rock" (a nickname for defendant Womack) had "a line" (a source of supply) on cocaine coming from Mexico into Texas. Trial Tr. 2/13/2017, p. 68-70. Pinkney identified defendant Womack as "D-Rock." Id. Pinkney testified that he knew that the average price of a kilogram of cocaine from Mexico was approximately $22,000, and they would be able to sell the kilograms for approximately $40,000 in Philadelphia and Chester. Id., at p. 71.

Pinkney testified that he expected that they would be getting at least 10 to 20 kilograms of cocaine from the Mexican source. Trial Tr. 2/13/17, p. 74. As a result of this information he received from Church, Pinkney began working on arrangements for he and Church to rent an RV to drive down to Texas, pick up the cocaine and drive it back to the Chester area or they would send the cocaine back via mail. Id. at pp. 75, 96.

Pinkney explained that in a call on January 29, 2014, he asked defendant Church whether he had received a confirmation from defendant Womack that everything was "good to go" – meaning that the Womack's Mexican source ("Daniel") was confirmed to come from Mexico to Houston, Texas with the cocaine for them. Trial Tr. 2/13/2017, pp. 98-101. Pinkney testified to intercepted calls between he and defendant Church regarding the development of the plans with the Mexican source. In some of those calls, defendant Church mentioned speaking with defendant Womack about the plans. Id. at pp. 91, 96, 100, 101, 114-116. It was Pinkney's understanding in the beginning that he, Church and Womack were involved in the plan and he later learned of defendant Coles' involvement as well. Id. at pp. 122-125.

On February 2, 2014, when Pinkney began to believe that the transaction with "Daniel" was not going to happen, defendant Church told Pinkney that defendant Womack had communicated with the Mexican source ("Daniel"), who had confirmed that the cocaine was going to be in Houston that day. Trial Tr. 2/13/17, pp. 120-122. On February 3, 2014, when defendant Church told Pinkney that defendant Womack still had not heard from the Mexican source regarding the status of the cocaine, Pinkney was certain that the transaction was not going to happen and he turned his focus to sources of cocaine in California. Id. at pp. 129-131.

14

Pinkney's testimony alone of Womack's participation in the scheme, if credited by the jury, would have been sufficient to establish his guilt of conspiracy. *United States v. Hernandez*, 962 F.2d 1152, 1155–57 (5th Cir.1992) (testimony by coconspirators regarding the defendant's participation in a conspiracy was, on its own, sufficient to sustain a marijuana distribution conspiracy charge even absent independent corroboration, because "[t]he jury ... credited [the coconspirators'] version of events"). Thus, Pinkney's testimony taken together with the intercepted communications and the other corroborating evidence was clearly more than sufficient to prove Womack's guilt beyond a reasonable doubt.

**Nathaniel Coles**

The government also presented sufficient evidence establishing defendant's Coles' participation in this conspiracy. The government presented evidence through the intercepted calls of defendant Coles' role in communicating with "Daniel" to carry out the plan to get the kilograms of cocaine from "Daniel." The evidence established that defendant Coles communicated with "Daniel" via electronic mail to convey messages between he ("Daniel"), and defendants Church and Womack. As further evidence of their conspiratorial relationship, Church and Womack were heard in the intercepted calls referring to defendant Coles as "Whatchamacallit," and "Daz."

On January 27, 2014, while discussing the arrangements for "Daniel" to send the kilograms of cocaine to Houston, "Daniel" asks Church, "…The message, you are the one that send the message, the email?" Church responded, "Naw, naw, I'm his other cousin." Trial Tr. 2/14/2017, p. 95-96. This call, led investigators to believe that one of the individuals involved in the conspiracy was communicating with "Daniel" via email. Id. at p. 96. Approximately an

hour later, investigators intercepted a call between defendants Church and Coles in which Coles identifies himself to Church as "Daz" and tells Church that, "the bull…the bull just hit me on the mail joint." Investigators were then able to confirm that Coles was the individual who communicated with "Daniel" via email, and that Coles was the individual whom defendants Church and Womack had previously referred to as "Whatchamacallit." Id. at pp. 99-103.

In intercepted calls, defendant Coles discussed details of the conspiracy with Church, and in other instances, Coles was discussed by defendants Church and Womack. On January 27, 2014, after Church spoke to defendant Coles, Church told Womack that, "Daz just called me, though, saying you was going to text him, call me, and have him call me," indicating that defendant Coles was going to have "Daniel" call Church. Trial Tr. 2/14/17, pp. 104-105. Minutes later, "Daniel" called Church and stated that he had received a message to call Church. Id. at p. 106.

On January 29, 2014, defendants Church and Womack discussed defendant Coles ("Whatchamacallit") emailing "Daniel." Trial Tr. 2/14/17, pp. 111-113. On that same day, Church called defendant Coles to ask whether Coles knew if "Daniel" had tried to call Church. Defendant Coles told Church that, "he hitting me like crazy too…" indicating that "Daniel" had been calling him (Coles) as well. Id. at p. 113. Church went on to tell defendant Coles to tell "Daniel" to "hit me back" – meaning call him (Church) back. Id.

On January 30, 2014, after Church wired the $300 to Texas, Church asked defendant Womack if he had told defendant Coles ("Daz") to call "Daniel" ("the bull"). Defendant Womack confirmed that defendant Coles had emailed "Daniel." Trial Tr. 2/14/17, p. 138. Defendant Womack then said he would check with defendant Coles and call Church back. Id.

16

On February 1, 2014, Church told defendant Womack, "…tell Daz (Coles) to hit the bull," meaning for Coles to call "Daniel." Trial Tr. 2/14/17, p. 142. Defendant Womack responded that he would call defendant Coles right then. Id. at p. 143. Telephone toll records showed a call between Womack's number and Coles' number approximately 30 minutes later. Id.

On February 1, 2014, defendant Womack confirmed with Church that he had instructed defendant Coles to call "Daniel." Trial Tr. 2/14/17, p. 144. In a later call, Church asked defendant Womack if defendant Coles had called "Daniel." Defendant Womack confirmed that defendant Coles contacted "Daniel" and Womack was just waiting to hear back. Id. at pp. 144-145. Church then called defendant Womack and instructed him to call defendant Coles because he thought "Daniel" was trying to call him (Church). Id. at pp. 145, 146. Telephone toll records showed a call from a defendant Coles' number to Church's phone number.

On February 2, 2014, defendants Church and Coles discussed whether "Daniel" had ever called Church like defendant Coles ("Whatchamacallit") said. Trial Tr. 2/14/17, p. 148. Church informed defendant Womack that he had spoken to defendant Coles the night before and he (Coles) said that he had contacted "Daniel." Id.

On February 3, 2014, while waiting for confirmation from "Daniel" that the cocaine was in Texas, defendants Church and Womack discussed something that "Daniel" had sent to defendant Coles. Defendant Womack stated that he would tell defendant Coles to text the information to Church. Trial Tr. 2/14/17, pp. 155-157. Approximately two minutes later, defendant Coles told Church that he had just spoken to defendant Womack ("D-Rock") and he

had already shown Church the information from "Daniel." Defendant Coles said that he had emailed "Daniel" telling him to call Church, but "Daniel" never responded. Id. at pp. 157-159.

On February 4, 2014, Church asked defendant Coles if he had heard from "Daniel." Defendant Coles replied that he had not heard from "Daniel" and thought Church had already left for Texas to get the cocaine based upon the information from "Daniel" that defendant Coles had shown to Church. Church told defendant Coles that he did not go to Texas because "Daniel" never called to confirm that the cocaine was actually in Texas. Defendant Coles asked Church if he wanted him to reach out to "Daniel." Trial Tr. 2/14/17, pp. 160-163. Defendant Coles told Church that he would send another email to "Daniel." Church and defendant Coles then discussed what Coles should tell "Daniel." Defendant Coles then seemingly read Church a message stating, "My friend, let my boy---let my boy know. We---we are walking tomorrow. We have everything set, good to be in that spot for Sunday......We keep in touch." Defendant Coles said he was going to "mail him another joint and ask him what's up," meaning that he would email "Daniel" regarding the status of the cocaine. Id. at pp. 163, 164. Defendant Coles then remembered that he had sent an email to "Daniel" that previous morning, in which he told "Daniel" that they (Church, Coles and Womack) were waiting on his call, but "Daniel" never responded to the message. Id. Church told defendant Coles to email "Daniel" and tell him to call him (Church). Defendant Coles said he would do it right then. Id. at p. 165.

On February 5, 2014, defendant Coles and Church discussed their frustration that "Daniel" never responded to either of them. Defendant Coles told Church that he emailed "Daniel" and wanted to read the message to Church. Defendant Coles asked Church if he called "Daniel's" number. Church asked defendant Coles what "Daniel's" number was again.

Defendant Coles checked through his emails and then read a Mexican phone number to Church which was different from the number that Church had for "Daniel." Church said he would try to call that number. Trial Tr. 2/14/17, pp. 166-171. This call also gave investigators the missing digit from the original number that defendant Womack gave to Church for "Daniel" on January 27, 2014. Id. at p. 171.

This evidence of Coles' communications with "Daniel" at the direction of Church and Womack was clearly sufficient to prove defendant Coles' membership in the conspiracy.

To further illustrate the conspiratorial relationship between the defendants, FBI Special Agent Robert Lockhart testified as to the phone contacts between members of the conspiracy. Agent Lockhart presented charts summarizing the telephone toll and pen register records which showed that between January 27, 2014, and February 5, 2014, the defendants had numerous phones contacts with each other and also each had phone contact with Mexican numbers attributed to "Daniel." Trial Tr. 2/15/2017, p. 114-123. For example, in reference to a call in which defendant Womack told Church that he would have defendant Coles get in touch with "Daniel," Special Agent Lockhart testified that within a half-hour, the phone records showed an outgoing call from defendant Womack's number to defendant's Coles' number. Id. at pp. 117-18. Finally, Special Agent Lockhart noted that there were no contacts between defendant Church and the numbers attributed to defendant Coles outside the time of the charged conspiracy. Id. at p. 123.

After examining the evidence presented at trial under the standards governing a motion for a judgment of acquittal, the government has met its burden in demonstrating that the trial verdict is legally sufficient and as such, the defendants' motions should be denied.

## IV. <u>CONCLUSION</u>

For the reasons discussed above, the Government presented sufficient evidence such that a rational jury could find that defendants Womack and Coles guilty of the conspiracy. Therefore, the defendants' Motion for Judgment of Acquittal and New Trial should be denied.

Respectfully submitted,

LOUIS D. LAPPEN
Acting United States Attorney

/s/ *Robert E. Eckert*
A. NICOLE PHILLIPS
ROBERT E. ECKERT
Assistant United States Attorney

CERTIFICATE OF SERVICE

I certify that on this day I caused a copy of the Government's Response in

Opposition to the Defendant's Motion for Judgment of Acquittal and New Trial to be served by

electronic mail upon:

> Daniel McGarrigle, Esq.
> daniel@mcgarriglelawfirm.com
> *Counsel for Nathanial Coles*
>
> Nathanial Da-Meir Coles
> Prisoner # 71667-066
> FDC-Philadelphia
> P.O. Box 562
> Philadelphia, PA 19106
>
> Donald Womack
> Prisoner # 57238-066
> FDC-Philadelphia
> P.O. Box 562
> Philadelphia, PA 19106

> /s/ Robert E. Eckert
> ROBERT E. ECKERT
> A. NICOLE PHILLIPS
> Assistant United States Attorney

Dated:   July 6, 2017